UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENTON MATTINGLY,

      Plaintiff,

vs.                            Case No.: 8:11-cv-00961-T-27TBM

UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES,

      Defendant.

_____/

## ORDER

**BEFORE THE COURT** is The Defendant's Motion for Summary Judgment (Dkt. 21), to

which Plaintiff has responded (Dkt. 31). Upon consideration, the motion (Dkt. 21) is GRANTED.

I.    FACTUAL BACKGROUND[1]

On April 18, 2008, Kenton Mattingly was hired by the University of South Florida Tampa

Police Department as a law enforcement officer (Dkt. 1 ¶ 8). USF requires all of its officers to work

rotating twelve-hour shifts and to complete a mandatory, sixteen-week field training program (Dkt.

26 at 59:1–60:13; Dkt. 28 ¶ 5; Dkt. 24 at 10:5-8). Even individuals with prior law enforcement

experience are not excused from training (Dkt. 24 at 11:19–20:2).

As a mandatory portion of the field training program, Mattingly was sprayed in the face with

pepper spray. According to Mattingly, the trainees were not provided enough water to adequately

flush their eyes and were forced to stand in front of fans, further aggravating the effects of the pepper

---

[1]All of the facts are undisputed, unless otherwise noted. Citations to depositions are made to the page and line
of the deposition transcript. All other citations are made to the page indicated on the header generated by the electronic
filing system.

spray (Dkt. 23 at 180:15-17). Despite the fans and lack of water, Mattingly did not immediately report any discomfort or complications from the pepper spray (Dkt. 26 at 37:6-25).

Approximately five to six weeks after the pepper spray, Mattingly notified his superiors of medical complications with his eyes (Dkt. 26 at 37:20-25). The complications were reported to USF's worker's compensation carrier, which, on June 16, 2008, recommended "no work" until Mattingly was seen by an opthamologist (Dkt. 23-3). The opthamologist, Dr. Bradley Fouraker, diagnosed Mattingly with a chemical burn and a congenital dry-eye condition (Dkt. 23-17). As a result, Mattingly was placed on medical leave. When Mattingly returned from medical leave, he was placed on light duty consistent with Dr. Fouraker's recommendations. Specifically, Dr. Fouraker stated that Mattingly was "not able to perform 12 hour shifts" and should avoid dust, dirt, and "drying conditions" (Dkt. 23-17 at 9).

On May 22, 2009, Rob Liddell, an employee relations consultant for USF, sent Mattingly a letter describing the process for requesting reasonable accommodations under the Americans with Disabilities Act (Dkt. 23-6). The letter requested a "description of the accommodation(s) sought after and, further, asks for physician documentation to support the requested accommodation" (*id.*). Mattingly first submitted a request for accommodations on November 16, 2009 (Dkt. 23-1), seeking three accommodations: (1) "Preferably assigned to an eight or possibly 10 hour work day"; (2) "Avoid prolong[ed] periods of using a computer especially in the sunlight, or in very dark conditions"; and (3) "Breaks as needed, to apply eye drops" (*id.*).

Although the November 16 letter was Mattingly's first formal request for accommodations, the same accommodations were mentioned in an August 28, 2009 letter from Mattingly to his superiors and Liddell (*see* Dkt. 23-8). In that letter, Mattingly discussed a potential law enforcement

2

opening at the USF Medical Center (*id.*). Mattingly believed a transfer to that position would meet all of his requested accommodations because it would include "a clean environment, limit[ed] exposure to dirt, dust, windy conditions, and decreased computer work" (*id.*). There is no dispute, however, that the conditions of duty at the Medical Center are not "sterile." Rather, Medical Center officers utilize an active "zone" approach and officers are responsible for several buildings and open spaces between the buildings, where they encounter dust and dirt (Dkt. 23-9 at 2; Dkt. 26 at 56:13–57:1). Moreover,  Assistant Chief of Police J.D. Withrow testified that the Medical Center positions were reserved for "seasoned officers with robust interpersonal skills," a level Mattingly had not reached (Dkt. 26 at 55:21-15).

On January 25, 2010, Mattingly emailed Lieutenant Donna Rodgers, the patrol commander, regarding his work status. In that email, he stated that Dr. Fouraker "appeared to be very receptive" to Mattingly resuming a twelve-hour shift in a patrol car (Dkt. 23-10). Lt. Rodgers responded the next day by informing Mattingly that he was to resume his field duty on February 5, 2010, working twelve-hour shifts during the day (*id.*). Despite that email, Mattingly did not return to field training and continued on light duty (Dkt. 28 ¶ 9).

On March 8, 2010, Mattingly filed an internal complaint with USF (Dkt. 23-11) relaying three grievances: (1) USF rejected his reasonable accommodations requests (except for breaks to use eye drops) and refused to transfer him to the Medical Center; (2) New College of Florida withdrew their conditional offer of employment to Mattingly because he allegedly failed to disclose his medical conditions in his application; and (3) a USF corporal retaliated against Mattingly by forcing him to take a trash bag to the street corner (*id.*).

As of March 1, 2010, Dr. Fouraker no longer restricted Mattingly to light duty, although he

did restrict Mattingly to ten-hour shifts (Dkt. 23-17 at 16). Also at that time, Mattingly was evaluated as having reached maximum medical improvement (Dkt. 28 ¶ 11). Based on those evaluations, Mattingly was again informed that he would be required to resume field training on April 2, 2010 (*id.*). But rather than returning to training, Mattingly took leave under the Family Medical Leave Act to have hernia surgery (Dkt. 23 at 186:14–187:20). While on leave, Mattingly submitted a second formal request for reasonable accommodations, dated June 8, 2010 (Dkt. 23-19). In this second request, he proposed the same accommodations that he requested on November 20, 2009. Namely, he sought an eight to ten hour work day with reduced computer use, breaks to apply eye drops, and reassignment to the Medical Center (*id.*). In response, USF offered Mattingly an assignment as a Parking Enforcement Specialist "as a reasonable effective accommodation," which Mattingly accepted (Dkt. 27 ¶¶ 4, 5; Dkt. 27-2).

On July 17, 2010, while working as a Parking Enforcement Specialist, Mattingly rubbed sunscreen in his eyes and aggravated his eye condition (Dkt. 22 at 135:3-10). As a consequence, Mattingly held his position but did not work from the date of the injury until he retired on February 1, 2011 (Dkt. 137:6-16). Mattingly testified that during the leave before his retirement, he received an email demanding that he return to work in parking, or else he would be fired, although that email is not in the record (Dkt. 23 at 167:4-24).

After retiring, Mattingly sued USF alleging discrimination and retaliation in violation of the American with Disabilities Act and the Florida Civil Rights Act of 1992. USF moves for summary judgment on all claims (Dkt. 21).

## II.    STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual

dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the

[non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir.

2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it

may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d

642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials on

file, that there are no genuine disputes of material fact that should be decided at trial. *Hickson Corp.

v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986)). If the moving party fails to demonstrate the absence of a genuine dispute, the

motion should be denied. *Kernel Records*, 694 F.3d at 1300 (citing *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 160 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606-08 (11th Cir. 1991)). Once

the movant adequately supports its motion, the burden shifts to the nonmoving party to show that

specific facts exist that raise a genuine issue for trial. *Dietz v. Smithkline Beecham Corp.*, 598 F.3d

812, 815 (11th Cir. 2010). The nonmoving party must "go beyond the pleadings," and designate

specific facts showing that there is a genuine dispute. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d

590, 593-94 (11th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). A mere scintilla of evidence in the

form of conclusory allegations, legal conclusions, or evidence that is merely colorable or not

significantly probative of a disputed fact cannot satisfy a party's burden. *Avirgan v. Hull*, 932 F.2d

1572, 1577 (11th Cir. 1991); *Kernel Records*, 694 F.3d at 1301.

The evidence presented must be viewed in the light most favorable to the nonmoving party.

*Ross v. Jefferson Cnty. Dep't of Health*, 695 F.3d 1183, 1185 (11th Cir. 2012). If there is a conflict

between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003). "Although all justifiable inference are to be drawn in favor of the nonmoving party," *Baldwin Cnty. v. Purcell*, 971 F.2d 1558, 1563-64 (11th Cir. 1992), "inferences based upon speculation are not reasonable." *Marshall v. City of Cape Coral*, 797 F.2d 1555, 1559 (11th Cir. 1986). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine dispute over a material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1998). However, if the nonmovant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981), *cert. denied*, 456 U.S. 1010 (1982).

The district court need not "parse a summary judgment record to search out facts or evidence not brought to the court's attention." *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006).

## III.   DISCUSSION

The ADA requires employers to make "reasonable accommodations" for "qualified individuals" who can perform the "essential functions" of the position they have or seek. An essential function of working as a USF patrol officer is the ability to work a twelve-hour shift, and there is no dispute that Mattingly was not able or willing to do so. Moreover, the accommodations proposed by Mattingly were not reasonable because they would have imposed an undue hardship on USF by compromising the police department's ability to maintain the public order and protect lives and property. Nor can Mattingly complain of retaliation because his voluntary decision to work as

a Parking Enforcement Specialist, a job conducive to his disability, is not an adverse employment decision, and Mattingly has offered no evidence that he would be able to satisfy his ultimate burden of proving that USF's actions were retaliatory. Mattingly's inability to work twelve-hour shifts and deliberate decision to move to parking enforcement entitle USF to summary judgment on all claims.

## A.   Discrimination

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The FCRA likewise makes it unlawful for an employer to "discharge or fail to refuse to hire any individual, or to otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . handicap . . . ." Fla. Stat. § 760.10. Because the FCRA is patterned after the ADA, FCRA claims are analyzed in the same manner. *Ross v. Jim Adams Ford, Inc.*, 871 So. 2d 312, 314 (Fla. 2d DCA 2004).

ADA claims are evaluated under the *McDonnell Douglas* burden-shifting framework applied to Title VII claims. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Under that framework, an employee alleging unlawful discrimination must first make a *prima facie* showing that "(1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Id.* at 1255-56. The employee may satisfy the third prong through showings of intentional discrimination, disparate treatment, or failure to make reasonable accommodations. *Rylee v. Chapman*, 316 Fed. Appx. 901, 906 (11th Cir. 2009) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008)). If the employee successfully

7

makes the *prima facie* showing required by *McDonnell Douglas*, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003). If the employer meets this burden, the presumption of intentional discrimination disappears, but the employee can still prove discrimination by offering evidence that the employer's explanation was pretext for discrimination. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

USF makes several arguments why Mattingly was not subject to discrimination. First, it argues that Mattingly was not a "qualified individual" under the ADA because he was unable to perform the "essential function" of working a twelve-hour rotating shift. Second, USF argues that even if Mattingly was qualified, his requested accommodations of an eight to ten hour work day and a transfer to the Medical Center were not reasonable because they would have imposed an undue hardship on USF.

In response, Mattingly focuses on the failure of USF to accommodate him with an eight to ten hour shift and USF's refusal to transfer him to the Medical Center. He argues that USF should have reinstated him to an eight-hour-a-day training program after which he should have been transferred to the Medical Center.

### 1. *Mattingly Is Not a "Qualified Individual."*

To invoke the protections of the ADA, Mattingly must first show that he is a "qualified individual with a disability." *See* § 12112(a). "Qualified" means that "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). If Mattingly is unable to perform an

essential function of the position, even with an accommodation, he is not a "qualified individual" and not covered by the ADA. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).

"Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Whether a function is essential is evaluated on a case-by-case basis. *Ivey v. First Quality Retail Serv.*, 490 Fed. Appx. 281, 285 (11th Cir. 2012) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)). Evidence of whether a particular function is essential includes, but is not limited to: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3). Although determining the essential functions of a position may be a fact-intensive inquiry, an ADA plaintiff "ultimately must shoulder the burden of establishing that [he] was able to perform all 'essential functions' of [his] position, at summary judgment," and the employee bears the burden of adducing competent evidence from which a rational factfinder could find in his favor. *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998).

USF argues that Mattingly is not a "qualified individual" because he was never medically cleared to work a twelve-hour rotating shift. Mattingly does not contend that he could work a full

shift, nor does the record demonstrate that he was medically cleared to work a twelve-hour day.[2] Even when he reached maximum medical improvement and was taken off light duty, Dr. Fouraker restricted him from working twelve-hour shifts (Dkt. 23-17 at 16; Dkt. 23-14). For Mattingly to be qualified, therefore, a twelve-hour shift cannot be an "essential function" of the position of a USF patrol officer.

Mandatory shift rotations are often considered an essential function of an employee's position,[3] particularly in law enforcement and hospitals where safety is a primary concern. *See Dicksey v. New Hanover Cnty. Sheriff's Dep't*, 522 F. Supp. 2d 742, 748 (E.D.N.C. 2007) (finding mandatory shifts of sheriff's deputies to be an essential function of the position where all similarly situated employees worked rotating shifts); *Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 Fed. Appx. 727, 729 (3d Cir. 2009) ("Given the nature of Miller's job, assisting during surgery performed in the hospital, we find it evident that attendance is an essential element of this position."); *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) (holding a 24-hour shift in the maternity ward of a hospital worked by all nurses was an essential function of the position). *Cf. Earl v. Mervyns, Inc.*,

---

[2]On June 10, 2009, Dr. Richard Kuehne performed an independent medical examination of Mattingly to determine whether he was fit for duty. Dr. Kuehne concluded that Mattingly was fit to perform "the typical duties of a police officer" (Dkt. 23-7). At that time, however, Mattingly's primary treating physician, Dr. Fouraker, was restricting Mattingly to light duty and even as late as April 2, 2010 would not allow Mattingly to return to twelve-hour shifts (*see* Dkts. 23-13, 23-14). The conclusions from Drs. Kuehne and Fouraker are not necessarily conflicting, as Dr. Kuehne did not determine Mattingly's ability to work a twelve-hour shift, focusing instead on the "typical duties of a police officer." Even if they do conflict, however, USF was entitled to rely on Dr. Fouraker's continuous restrictions as Mattingly's treating physician. *See Burgos-Stefanelli v. Sec., U.S. Dep't of Homeland Sec.*, 410 Fed. Appx. 243, 247 (11th Cir. 2011) (employer's reason for termination based on medical reports submitted by treating physicians were legitimate and non-discriminatory).
    Even if minimal evidence exists on the record suggesting that Mattingly may have been able to perform twelve-hour shifts, no reasonable jury would find for Mattingly on this point due to Dr. Fouraker's restrictions and Mattingly's inability and refusal to resume twelve-hour shifts even after he was found to have reached maximum medical improvement. *See* Dkt. 23-13 (stating that Mattingly's doctor will not agree to reinstating Mattingly to twelve-hour shifts).

[3]*See Rehrs v. Iams Co.*, 486 F.3d 353, 356-57 (8th Cir. 2007) (holding that employer was not required to allow disabled employee to work a different shift than all other employees where it was shown that the accommodation would cause other employees to work harder, longer, or be deprived of opportunities).

207 F.3d 1361, 1366 (11th Cir. 2000) (concluding that punctuality is an essential function of the job because, among other reasons, failure to be on time or work a full shift would force other employees to work a longer shift).[4] Indeed, the Supreme Court has supported this concept more broadly, holding that the operation of a neutral scheduling system designed to meet the needs of all employees "cannot be an unlawful employment practice even if the system has some discriminatory consequences." *TransWorld Airlines, Inc. v. Hardison*, 432 U.S. 63, 82 (1977).

This concept is supported by USF's undisputed evidence demonstrating that a twelve-hour rotating shift is an essential function for its patrol officers. Significantly, all of USF's patrol officers work twelve-hour shifts, with no exceptions (Dkt. 26 at 59:1–60:13; Dkt. 28 ¶ 5; Dkt. 24 at 10:5-8), and USF considered the twelve-hour shift to be essential (Dkt. 22 at 51:1-3; Dkt. 23-9 at 2). *See* §§ 1630.2(n)(3)(i), (n)(3)(vi), (n)(3)(vii). Shorter shifts for Mattingly would have disrupted the rotation for other officers and forced USF to deny shift preferences, change work schedules, ignore the collective bargaining agreement, and "limit the flexibility of the patrol division to respond to its operational needs and provide for public safety" (Dkt. 28 ¶ 10(c); *see* Dkt. 25 at 25:22–28:4; Dkt. 26 at 54:10-22, 60:7-16). *See* § 1630.2(n)(3)(iv).[5] His undisputed inability to work full shifts inures

---

[4]*See also DeVito v. Chicago Park Dist.*, 270 F.3d 532, 534 (7th Cir. 2001) ("[T]o perform the essential functions of their job . . . requires that they be capable of working full-time."); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1146-47 (10th Cir. 2011) (noting that an employee who proposes working part-time as a reasonable accommodation will have difficulty proving that he can perform the essential functions of the position because "[f]or a number of positions . . . regular attendance may fairly be characterized as an essential function"); *Szabla v. St. John Hosp. & Med. Ctr.*, 2011 WL 3714068, at *7 (E.D. Mich. Aug. 24, 2011) (holding employees restricted to eight-hour shifts to be unqualified when the hospital position required twelve-hour shifts).

[5]It is of no moment whether Mattingly could have completed his field training by working eight to ten hour days (*see* Dkt. 26 at 61:3-17), because he would have eventually been faced with the prospect of working twelve-hour shifts as an officer (*see id.* at 63:10-15). The ADA does not require that an employer permanently provide the employee with light duty work, eliminating the essential functions of the job. *Ivey*, 490 Fed. Appx. at 286. In other words, once Mattingly finished training, USF had no duty to continue to offer Mattingly eight to ten hour shifts after he was fully trained, because that would have eliminated one of the essential functions of the job. *See also Earl*, 207 F.3d at 1367 ("An employer is not required to reallocate job duties in order to change the essential functions of a position.").

to the detriment of USF and the other patrol officers, and he therefore cannot fulfill this essential function of the position.

### 2. *Mattingly Did Not Request Reasonable Accommodations*.

Even if Mattingly could fulfill the essential functions of the position, USF is still entitled to summary judgment because the accommodations he sought would impose an undue hardship on USF. Accommodations sought by a qualified individual must be "reasonable." These modifications or adjustments to the manner in which the position is usually performed may include part-time or modified work schedules, reassignment to a vacant position, adjustment of policies, or other similar actions. *Id.* § 1630.2(o)(2)(ii). An employer is required to provide a reasonable accommodation unless it would create an undue hardship. *Id.* § 1630.2(o)(4).

"Undue hardship" generally means significant difficulty or expense incurred by the employer in providing the requested accommodation. *Id.* § 1630.2(p)(1). Factors to be considered in determining whether an accommodation would impose an undue hardship include the nature and cost of the accommodation, the overall financial impact of the accommodation on the employer, the type of operations of the employer, and the impact of the accommodation on day-to-day operations, including the impact on the ability of other employees to perform their duties. *Id.* § 1630.2(p)(2). The Supreme Court has described "undue hardship" as any act requiring an employer to bear more than a "*de minimis* cost" in accommodating an employee. *Trans World Airlines*, 432 U.S. at 84 n.15.

### a. Eight-to-Ten-Hour Work Day.

Mattingly's first requested accommodation was working an eight to ten hour work day as opposed to the standard twelve-hour shift. Accommodating Mattingly's request for working shorter shifts, however, would impose an undue hardship on USF by forcing it to deny shift preferences to

other officers and change officers' work schedules, and limiting the flexibility of the patrol division to respond to its operational needs and provide for public safety (Dkt. 28 ¶ 10(c)). These consequences are significant, especially because the USF police department is tasked with maintaining public order and protecting lives and property. *See Beadle v. City of Tampa*, 42 F.3d 633, 638 (11th Cir. 1995) (requiring a police department to grant shift exceptions would result in a greater than *de minimis* cost and constitute and undue burden); *U.S. v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976) ("In our view when the 'business' of an employer is protecting the lives and property of a dependent citizenry, courts should go slow in restructuring his employment practices.").

Accommodating Mattingly's request not only imposes an undue burden on USF, but it eliminates an essential function of the position he seeks: the mandatory twelve-hour shift. Accommodations that eliminate essential functions of the position or violate internal policies are categorically unreasonable, and USF is not required to provide a shorter shift to someone who is unable to be present for the duration of his mandatory shift. *Shepard v. United Parcel Serv., Inc.*, 470 Fed. Appx. 726, 730 (11th Cir. 2012) (citing *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1307 (11th Cir. 2000); *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir. 1997)); *Anderson v. Embarq/Sprint*, 379 Fed. Appx. 924, 928 (11th Cir. 2010) (holding that requesting forklift work only in a position that required lifting boxes up to seventy pounds was unreasonable because the requested accommodation "would eliminate an essential function of [the] job").[6]

### b.   Transfer to the Medical Center.

---

[6]Again, it is of no moment whether Mattingly could have been placed on an eight-hour accelerated training program because he eventually would have been placed back on full patrol. Nor was Mattingly's desire to go on eight-hour training and then be transferred to the Medical Center, where officers work eight-hour days, reasonable because Mattingly was not qualified for that position. *See infra*.

Nor is transfer to the Medical Center a reasonable accommodation. Reassignment to a vacant position in a company is one in a range of reasonable accommodations which must be considered and, if appropriate, offered if the employee is unable to perform his current job. *See* § 1630.2(o)(2)(ii). But, "[r]eassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified." *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997). *See also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1169 (10th Cir. 1999) (en banc) ("Anything more, such as requiring the reassigned employee to be the best qualified employee for the vacant job, is . . . unwarranted by the statutory language or its legislative history."); *Sinyan v. Swedish Hosp. Med. Ctr.*, 482 Fed. Appx. 209, 210 (9th Cir. 2012) (ADA claim properly dismissed where employee failed to allege facts showing she was qualified for a position for which she was seeking transfer).

Assistant Chief Withrow testified that the Medical Center positions were reserved for "seasoned officers with robust interpersonal skills" (Dkt. 26 at 55:21-15). Mattingly has not offered any evidence demonstrating that he was qualified for this position. Rather, the record demonstrates Mattingly was not "seasoned" and had yet to finish the basic training course required of all Medical Center officers. Moreover, Assistant Chief Withrow testified that there never was a vacancy at the Medical Center, and Mattingly has offered no proof otherwise (Dkt. 26 at 55:18). USF was not required to place Mattingly in a position he was not qualified for, nor was it obligated to create a position at the Medical Center solely to accommodate him. *See Dickerson v. Sec., Dep't of Veterans Affairs Agency*, 489 Fed. Appx. 358, 361 (11th Cir. 2012) (holding that the ADA "did not require the VA to reassign Dickerson to a position where there were no vacancies, create an entirely new position for her, or reallocation the essential functions of her nursing position"); *Terrell v. USAir*,

14

132 F.3d 621, 626 (11th Cir. 1998) (holding that an employee's requested accommodation or reassignment to a part-time job was unreasonable because no party-time jobs were available at the time of the request and fulfilling the request would have required the employer to create a new position).

Even if USF could have transferred Mattingly to a non-existent position for which he was not qualified, it need not do so because the governing collective bargaining agreement allows only employees with "permanent status" to apply for a transfer to a different position (Dkt. 28-2 at 9 ¶ 9.1). For the duration of his employment, Mattingly was on "probationary" status and never rose to become an employee with "permanent status." (Dkt. 28 ¶ 10(b)). Allowing Mattingly to apply to an open position in the Medical Center would have violated the collective bargaining agreement, an action USF was not required to take. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000) (employer need not violate a collective bargaining agreement or contravene the seniority rights of other employees under that agreement).

There is no dispute that Mattingly was not a "qualified individual" and that his requested accommodations were not "reasonable" and would have imposed an undue burden on USF.[7] Mattingly, therefore, cannot present a *prima facie* case of discrimination, and USF is entitled to summary judgment on Counts I and II. *See Kurzweg v. SCP Distributors, LLC*, 424 Fed. Appx. 840, 844 (11th Cir. 2011) (affirming summary judgment on FCRA claims based on ADA analysis); *Kay v. Lester Coggins Trucking, Inc.*, 141 Fed. Appx. 824, 826 (11th Cir. 2005) (same).

---

[7]USF agreed to provide other reasonable accommodations requested by Mattingly, including ergonomic equipment to increase visual accessibility and reduce eye strain during patrols and breaks as necessary to apply eye drops (Dkt. 23-9 at 3).

## B.   Retaliation[8]

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) he engaged

in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was

a causal link between the adverse action and her protected expression. *Luna v. Walgreen Co.,* 347

Fed. Appx. 469, 472 (11th Cir. 2009) (citing *Lucas*, 257 F.3d at 1260). Once the plaintiff establishes

a *prima facie* case of retaliation, the burden shifts to the employer to articulate a non-retaliatory

reason for its treatment of the employee. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th

Cir. 2001). If the employer presents a legitimate explanation for its actions, the burden then returns

to the plaintiff to show that the explanation is pretextual. *Id.* Mattingly's claims fail on two points.

First, Mattingly has not established that he suffered an adverse employment action, and therefore

fails to establish a *prima facie* case of retaliation. Second, even if a *prima facie* case is established,

Mattingly has not satisfied his ultimate burden of adducing evidence that USF's explanation for its

employment actions were pretext for retaliation.

### 1.    *Mattingly Did Not Suffer an Adverse Employment Action.*

In his First Amended Complaint, Mattingly alleges that USF "embarked on a retaliatory

campaign of subjecting [Mattingly] to harassment, further disparate treatment and created a hostile

work environment aimed at constructively terminating" him as a result of the discrimination

---

[8]Mattingly has not responded to USF's motion for summary judgment on the retaliation claims, and it is therefore deemed unopposed. When a motion for summary judgment is unopposed, summary judgment may be granted if the moving party presents sufficient evidence to show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. *Quarles v. Nationwide Prop. & Cas. Ins. Co.*, No. 12-15226, 2013 WL 598334, at *1 (11th Cir. Feb. 15, 2013); *U.S. v. $688,670.42 Seized from Regions Bank Account No. XXXXXX5028*, 449 Fed. Appx. 871, 873 (11th Cir. 2011). *See* Fed. R. Civ. P. 56; *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Fla.*, 363 F.3d 1099, 1101-02 (11th Cir. 2004) ("The district court need not sua sponte review all of the evidentiary materials on file at the time the motion is granted, but must ensure that the motion itself is supported by evidentiary materials. At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment.").

complaint filed with USF's Diversity and Equal Opportunity Office (Dkt. 7 ¶¶ 14, 15). Mattingly, however, does not expressly allege what actions were retaliatory. USF construes the First Amended Complaint as alleging that ordering Mattingly return to field training on April 2, 2010 was the retaliation. A fair reading of the First Amended Complaint also reveals that Mattingly alleges that his "demotion" to a position in parking enforcement, which allegedly led to his constructive termination, was retaliatory (*id.* ¶ 19). It is unclear on which action Mattingly pins his claims, or whether he intends the events to intertwine to form a single occurrence, so both actions will be addressed.

a.   <u>Mattingly's Return to Field Training Was Not an Adverse Employment Action.</u>

"An adverse employment action includes employer conduct 'which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related.'" *Watson v. Ala. Farmers Coop., Inc.*, 323 Fed. Appx. 726, 729 (11th Cir. 2009) (quoting *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008)). A "materially adverse" action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crawford*, 529 F.3d at 974 (quoting *Burlington N. v. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). If a reasonable jury could conclude that the employer's response to the plaintiff's complaint might deter a reasonable employee from lodging a complaint, then the plaintiff has satisfied his burden of showing an adverse employment action. *See Kurtts v. Chiropractic Strategies Group, Inc.*, 481 Fed. Appx. 462, 468 (11th Cir. 2012) (citing *Crawford*, 529 F.3d at 974).

In the Spring of 2010, USF was presented with multiple evaluations indicating that Mattingly was able to return to full duty. Dr. Fouraker no longer restricted Mattingly to light duty, although he did restrict Mattingly to ten-hour shifts (Dkt. 23-17 at 16), and Mattingly had reached maximum

17

medical improvement (Dkt. 28 ¶ 11). Supported by a letter from Mattingly indicating his fitness to return to duty (Dkts. 23-10), USF scheduled his return to full-time training for April 2, 2010 (Dkt. 23-20).

Mattingly's reinstatement to field training was not an adverse employment action because it did not cause a "serious and material change in the terms, conditions, or privileges of employment." *Crawford*, 529 F.3d at 970-71. Mattingly has not explained why reinstatement to full shifts within a position he already occupied would constitute a "serious and material change" to his employment conditions. More importantly, however, No reasonable jury would conclude that Mattingly's reinstatement to field training would dissuade a reasonable worker from making a claim of retaliation. *See Rainey v. Holder*, 412 Fed. Appx. 235, 238 (11th Cir. 2011) ("It is unlikely that . . . a reasonable employee, standing in Rainey's shoes, would have felt dissuaded from filing a complaint of discrimination."). Reinstatement to full time work in the position sought by Mattingly simply cannot be construed in such a manner that an employee would be dissuaded from filing a complaint in the future. Mattingly's return to field training, therefore, was not a "materially adverse" employment action.

> b.   Mattingly's Transfer to Parking Services Was Not an Adverse Employment Action.

After Mattingly refused to return to field training and instead took FMLA leave, USF offered him a Parking Enforcement Specialist position as a as a "reasonable effective accommodation" to his request that he work eight to ten hour days (Dkt. 27 ¶¶ 4, 5). While on leave, Mattingly voluntarily accepted the position without any apparent consternation (Dkt. 27-2). He now alleges that USF's offer, and his acceptance, of the Parking Enforcement Specialist position constitutes an adverse employment action, which eventually resulted in his constructive termination.

Despite Mattingly's protestations, an employee's deliberate choice to alter his employment status does not constitute an adverse employment action. *See Lara v. Raytheon Tech. Serv. Co., LLC*, 476 Fed. Appx. 218, 222 (11th Cir. 2012) ("Because Lara's choice to temporarily leave his job was not a materially adverse employment action, he fails to establish a *prima facie* case of retaliation."). In *Turley v. SCI of Alabama*,[9] the employer gave the employee a choice between remaining in her current position or taking a lesser position, which the employee termed a "demotion." The employee voluntarily accepted the demotion and eventually sued for retaliation. On summary judgment, the district court held, and the Eleventh Circuit affirmed, that the employee's choice to move to a lesser position was not an actionable adverse employment action because the "demotion was not the result of a deliberate decision" of the employer. *Id.*

Mattingly chose to move to a position with parking services. There is no evidence that Mattingly was forced into this decision, that it was the only viable option for returning to work, or that the transfer was "the result of a deliberate decision" by USF. *Id.* Indeed, when Mattingly accepted the position while on FMLA leave, there was no evidence that he would not have been permitted to return to light duty or full-time training if he was able. Mattingly's assignment to parking enforcement was a voluntary choice on his part, and did not constitute an actionable adverse employment action.

Even if the assignment could be viewed as an adverse employment action, Mattingly offers no evidence that USF's reasons for offering the assignment were pretext for discriminatory retaliation. Because he bears the ultimate burden of demonstrating that an adverse employment action was pretext for retaliation, and he has not presented any evidence by which he could satisfy

---

[9]190 Fed. Appx. 844, 846 (11th Cir. 2006).

that burden, USF is entitled to judgment as a matter of law. *See Jeudy v. Attorney Gen., Dep't of Justice*, 482 Fed. Appx. 517, 522 (11th Cir. 2012) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)).

          c.     <u>Mattingly Was Not Constructively Discharged.</u>

       After working in parking services for about one month, Mattingly's eye injury was aggravated by sunscreen he was applying during the job. Mattingly took medical leave, never to return to the position, "retiring" approximately six months later, on February 1, 2011. Mattingly alleges that his departure from parking services was not voluntary, but forced by unbearable conditions of employment. Essentially, Mattingly is claiming that he was constructively discharged from his position.

       If Mattingly's retaliation claim is based on this theory of constructive discharge, rather than on the transfer, USF is still entitled to judgment as a matter of law. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)). When alleging constructive discharge, a plaintiff must show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Id.* (quoting *Virgo v. Riviera Beach Ass'n, Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994)). An employer cannot defend against a constructive termination charge "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Id.* at 1299 (quoting *Pa. State Police v. Suders*, 542 U.S. 129,

134 (2004)). Involuntary resignation may constitute constructive discharge, but only where the employer (1) forces the resignation by coercion or duress, or (2) obtains the resignation by deceiving or misrepresenting a material fact to the employee. *Ross v. City of Perry, Ga.*, 396 Fed. Appx. 668, 670 (11th Cir. 2010) (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)).

Mattingly cannot demonstrate constructive discharge because his decision to accept the position as a Parking Enforcement Specialist was voluntary. *See Cleveland v. S. Disposal Waste Connections*, 491 Fed. Appx. 698, 708 (6th Cir. 2012). USF did not "deliberately" make his working conditions intolerable, nor was the allegedly adverse action "employer-sanctioned." *Bryant*, F.3d at 1299. Moreover, Mattingly has offered no evidence that his work environment as a Parking Enforcement Specialist was "so unbearable that a reasonable person in that person's position would be compelled to resign." *Id.* at 1298.[10] Indeed, his limited time span as a Parking Enforcement Specialist and six-month delay before resigning make it highly unlikely that Mattingly was subject to intolerable working conditions, or that he could prove as much before a jury. *Cf. Simpson v. State of Ala. Dep't of Human Resources*, No. 12-11710, 2012 WL 6621400, at *2 (11th Cir. Dec. 18, 2012) (for retaliation purposes, a "lapse in time beyond three or four months, in the absence of other evidence tending to show causation, is insufficient to show close temporal proximity").

Mattingly, therefore, cannot demonstrate an adverse employment action, and USF is entitled to summary judgment on his claims of retaliation.

    **2.**    ***Mattingly Cannot Prove that his Return to Field Training on April 2, 2010 Was Retaliatory.***

---

[10]Nor can the temporal proximity of Mattingly's complaints to the alleged adverse employment actions foreclose the possibility here of summary judgment. *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (holding that where ample legitimate reasons supported an adverse employment decision, temporal proximity alone was insufficient to meet plaintiff's burden of showing employer's articulated reasons for termination was pretextual).

21

Moreover, USF is entitled to summary judgment even if Mattingly could demonstrate an adverse employment action, because he fails to provide sufficient evidence to rebut the presumption in favor of USF that its actions were legitimate and non-retaliatory. Once an employer proffers a legitimate, non-retaliatory reason for an adverse employment action, the burden shifts to the plaintiff to show that the proffered reason is pretext for prohibited, retaliatory conduct. *Leeth v. Tyson Foods, Inc.*, 449 Fed. Appx. 849, 854 (11th Cir. 2011) (citing *Olmstead v. Taco bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)). Assuming that Mattingly casts his reinstatement on April 2 as an adverse employment action, USF has proffered a legitimate, non-retaliatory reasons for its action: USF learned that Mattingly had reached maximum medical improvement and Dr. Fouraker no longer required Mattingly to serve light duty. Now faced with the burden of proof, Mattingly has not provided any evidence that his reinstatement was pretext for prohibited, retaliatory conduct that would "allow a factfinder to disbelieve [USF's] proffered explanation for its actions." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1532 (11th Cir. 1997). Indeed, the record does not reveal any evidence of pretext, and Mattingly is not permitted to state in a conclusory fashion that the employment action was pretextual without offering substantial evidence to support his claim. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

## CONCLUSION

Mattingly cannot demonstrate a *prima facie* case of discrimination or retaliation under the

ADA or FCRA. His inability to work a full, twelve-hour shift, an essential function of his position, precludes him from being a qualified individual entitled to protection under the ADA. Further, his requested accommodations were not reasonable and would cause USF undue hardship. His retaliation claims likewise fail because he never suffered an adverse employment action and failed to adduce sufficient evidence from which a reasonable jury could conclude that the reasons for USF's employment actions were pretext for retaliation.

Accordingly,

1) Defendant's Motion for Summary Judgment (Dkt. 21) is GRANTED.

2) The Clerk is directed to ENTER final judgment in favor of Defendant University of South Florida Board of Trustees on all claims.

3) The Clerk is directed to CLOSE the file.

**DONE AND ORDERED** this _14th_ day of March, 2013.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of Record